majority, or by a much greater number of your body than the twelve peers prescribed by the law of the land. This point has, I believe, excited some doubts upon former occasions, but those doubts have never arisen in the mind of any lawyer, and they may be easily removed by a proper consideration of the subject; for the bills or presentments, found by a grand jury, amount to nothing more than an official accusation in order to put the party accused upon his trial; till the bill is returned there is, therefore, no charge from which he can be required to exculpate himself; and we know that many persons, against whom bills were returned, have been afterwards acquitted by a verdict of their country. Here then is the just line of discrimination. It is the duty of the grand jury to inquire into the nature and probable grounds of the charge; but it is the exclusive province of the petit jury to hear and determine, with the assistance and direction of the court upon points of law, whether the defendant is or is not guilty on the whole evidence for, as well as against, him; you will therefore readily perceive that if you examine the witnesses on both sides, you do not confine your consideration to the probable grounds of charge, but engage completely in the trial of the cause; and your return must, consequently, be tantamount to a verdict of acquittal or condemnation. But this would involve us in another difficulty; for, by the law, it is declared that no man shall be twice put in jeopardy for the same offence; and yet it is certain that the inquiry now proposed by the grand jury, would necessarily introduce the oppression of a double trial. Nor is it merely upon maxims of law, but I think, likewise, upon principles of humanity, that this innovation should be opposed. Considering the bill as an accusation grounded entirely upon the testimony in support of the prosecution, the petit jury received no bias from the sanction which the endorsement of the grand jury has conferred upon it. But on the other hand would it not, in some degree, prejudice the most upright mind against the defendant, that on a full hearing of his defence, another tribunal had pronounced it insufficient, which would then be the natural inference from every true bill. Upon the whole the court is of opinion, that it would be improper and illegal to examine the witnesses on behalf of the defendant while the charge against him lies before the grand jury."

In regard to the question of law submitted to this court by the grand jury the court instructs them, that if, in any case before them, they shall be satisfied by the evidence adduced on the part of the prosecution that the party accused committed the unlawful act with which he is charged, they have no right to send for and examine witnesses to prove mere matter of justification or excuse. If such a course could be permitted it would require the United States to produce other witnesses either to discredit those thus produced on the part of the defendant, or to disprove the facts to which they are called to testify, and thus the whole trial of the cause would be drawn before the grand jury, out of the presence of the court and the counsel of the parties. In regard to the particular case which has been the cause of this application to the court we can say nothing, as we are not judicially acquainted with its circumstances. The instruction which the court gives is intended to be general.

[The prisoner was found not guilty because of insanity. Case No. 15,577. See same case for opinion previously delivered in habeas corpus proceeding.]

---

## Case No. 15,577.

### UNITED STATES v. LAWRENCE.

[4 Cranch, C. C. 518.] [1]

Circuit Court, District of Columbia.  March Term, 1835.

BAIL—EXCESSIVE BAIL—INSANITY—HABEAS CORPUS.

1. In a case clearly bailable by law, to require larger bail than the prisoner can give, is, in effect, to refuse bail.

2. The discretion of the magistrate, in taking bail in a criminal case, is to be guided by the compound consideration of the ability of the prisoner to give bail, and the atrocity of the offence.

3. The prisoner having been fully committed for trial upon a charge of an assault upon the president of the United States, with intent to kill and murder him; the chief judge refused to issue a habeas corpus to bring him up for the purpose of examining witnesses to prove his insanity; and, for that cause "to discharge him from imprisonment in the common gaol, and to secure the public peace by proper restraint."

[Cited in Parsons v. State, 81 Ala. 577, 2 South. 862.]

4. If the prisoner be acquitted by the verdict of the jury, on the ground of insanity, the court will remand him to the custody of the marshal; on being satisfied that it would be dangerous to permit him to be at large while under mental delusion.

On the 30th of January, 1835, the prisoner, Richard Lawrence made an assault upon the president of the United States (General Jackson), with intent to murder him, by shooting him with a pistol as he came out of the rotunda of the capitol, after having attended the funeral service of Warran R. Davis, a member of the house of representatives. Both pistols missed fire, although the percussion caps of both exploded, and both were well loaded with powder and ball. He was arrested in the very act, and was immediately brought before the chief judge at his chambers. The assault with intent to kill was proved by the clearest possible evidence. There was no evidence then produced of his insanity. The prisoner's manner was calm, and he seemed indifferent as

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

to the testimony; declined cross-examining the witnesses, and when informed by the chief judge that he might make any remarks which he thought proper to make, said he could not contradict what the gentlemen had said. After inquiring as to his property and circumstances, the chief judge said to Mr. Key, the district attorney, that he supposed bail in $1,000 would be sufficient. as it was not a penitentiary offence, there being no actual battery, and as he did not appear to have any property. Mr. Key seemed, at first, to acquiesce, but having conversed with some of the president's friends who stood round him, he suggested the idea that it was not impossible that others might be concerned who might be disposed to bail him, and let him escape to make another attempt on the life of the president, and therefore thought that a larger sum should be named. The chief judge then said that there was no evidence before him to induce a suspicion that any other person was concerned in the act; that the constitution forbade him to require excessive bail; and that to require larger bail than the prisoner could give would be to require excessive bail, and to deny bail in a case clearly bailable by law. 1 Chitty. Cr. Law, 131. That the discretion of the magistrate in taking bail in a criminal case, is to be guided by the compound consideration of the ability of the prisoner to give bail, and the atrocity of the offence. That as the prisoner had some reputable friends who might be disposed to bail him, he would require bail in the sum of $1,500. This sum, if the ability of the prisoner only were to be considered is, probably, too large; but if the atrocity of the offence alone were considered, might seem too small; but taking both into consideration, and that the punishment can only be fine and imprisonment, it seemed to him to be as high as he ought to require. The prisoner not being able to find bail to that amount. was committed for trial. by warrant of the chief judge. A few days afterward, namely. on the 5th of February, 1835, a petition for a writ of habeas corpus, signed by Mr. William L. Brent and his son as counsel for the prisoner, and supported by affidavit. was presented to the chief judge, to bring up the prisoner for the purpose of examining witnesses to prove his insanity, and that he may be discharged from imprisonment "for the cause for which he is now confined," "and that your honor do then in the premises what belongs to humanity and the unfortunate Richard Lawrence. and also to secure the public peace by proper restraint."

The chief judge having expressed a doubt of the propriety of issuing the habeas corpus. upon that ground. the prisoner's counsel addressed to him the following letter:

"Thursday Evening. February 5th. 1835. Sir: Since I saw you this morning I have conversed with several of our most eminent jurisconsults. who are of the opinion that the case of Lawrence is a fair and proper one for an application for a habeas corpus, and that cases of insanity are an exception to general principles; moreover, that upon an habeas corpus, the judge at his chambers ought not to confine his investigation to the commitment alone, but ought to look at the cause of it; and upon looking at the act of congress I find it expressly declares that a judge at his chambers 'shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment.' If this be the object, most certainly you have the right, upon the application I have made, to inquire into the cause; and if you find that the cause is the assault by an insane and deranged man, it is insufficient. I find this principle also laid down in Bollman's Case. 2 Pet. Cond. R. 43, or 4 Cranch [8 U. S.] 75. It is also decided, in the same case. 2 Pet. Cond. R. 46, at the bottom, that the writ of habeas corpus is, in its nature, a revision of the decision to commit for an offence; and the court there say: 'This writ (habeas corpus) must always be for the purpose of revising that decision;' (meaning the cause for the commitment). The application is urged by the friends of the unfortunate man. and Mr. Key states to me that he has no objection to it, and intimates an opinion that it would be but right that the habeas corpus should issue. Independent of the rights of the individual, and the injustice of his present confinement, upon the grounds upon which it has been made. the committing judge not knowing of his insanity, and there being no counsel appointed to represent him at the examination, I do think that the public feeling ought to be allayed. if possible, by a true statement and understanding of the case. It is impossible the law can sanction an insane man's being confined for a crime that he is incapable of committing. when the fact of his insanity can be established without a doubt. and was not known at the time he was committed, and the insane man incapable of making it known. Such a construction of the law. I humbly conceive, would be attended by the most injurious consequences. and great oppressions might arise. Yours most respectfully. W. L. Brent. P. S. Should you refuse the habeas corpus, I will thank you to give your reasons on the back of the petition. It is thought, by those who take an interest in the application, and by me also, that it may aid in another course that will be pursued; and as it is a high privilege secured to the citizen. the refusal ought to be accompanied by the reasons. Will you say to my son when we can call upon you again? William L. Brent."

Upon the 14th of February. 1835. the petition for the habeas corpus was returned to the prisoner's counsel with the following opinion (CRANCH, Chief Judge):

"On the petition of Richard Lawrence for

a writ of habeas corpus. I have attentively considered the within petition, and have taken time to look into the authorities on the subject. The petition is not accompanied by a copy of the warrant of commitment, probably because it was presumed that it was fresh in my recollection, as it was issued by myself. As well as I recollect, it states that I had probable cause, supported by the oaths of certain witnesses therein named, to believe that Richard Lawrence, who was then before me in the custody of the marshal, had, on that day (30th of January, 1835), in the county of Washington, in this District, made an assault upon Andrew Jackson, president of the United States, with intent to kill him, and therefore commanded the marshal to keep him in safe custody, until he should be discharged in due course of law. Upon the best consideration which I have been able to give to the subject, I am of opinion that I ought not to grant the prayer of the petition: (1) Because it appears by all the authorities that a writ of habeas corpus is not to be granted of course in the first instance, upon application merely; and the obligation to issue it ineffectually, can only exist when the commitment is so general, that the court cannot know the real occasion from the terms in which it is worded; for it is not to be awarded without some reasonable ground shown by affidavit. And in Hobhouse's Case, 3 Barn. & Ald. 420, it was decided by the court of king's bench in England, as late as 1820, that the court will not, in the first instance, grant a habeas corpus, when they see that, in the result, they must inevitably remand the party. See, also, 10 Petersd. 289 (Eng. Ed.) Habeas Corpus, B, in the note; 1 Chit. Cr. Law, 118, 123, 124; and Watkins' Case, 3 Pet. [28 U. S.] 201, where Chief Justice Marshall says: "The writ ought not to be awarded, if the court is satisfied that the prisoner would be remanded to prison.' (2) Because the affidavit accompanying the petition for the habeas corpus, does not show sufficient ground for issuing it. The only fact stated as the ground of discharge, is, the insanity of the prisoner; and, for that cause, I am requested to discharge him, and 'to do what belongs to humanity' and to the prisoner, and 'to secure the public peace by proper restraint.' I would remark, here, that if the prisoner is a dangerous maniac, the only manner in which I could secure the public peace (or rather secure the public safety) would be, to remand him to the prison where he now is. His imprisonment then would be interminable; he would have no day in court; no means to compel a trial, no right to apply for a discharge for want of trial, and no right to bail. He could not be bound to keep the peace. If sureties should be bound for his keeping the peace, it is doubtful whether they could ever be liable upon their recognizances, whatever acts he might

do; as I apprehend, a madman cannot be guilty of a technical breach of the peace. I have said that I could only remand him to the prison where he now is. Unfortunately, the claims of humanity upon this subject have not yet been duly appreciated by our legislators, although they have had before them for more than thirty-four years, the example of the British parliament, in the act of 39 & 40 Geo III. c. 94, which was introduced in consequence of the case of Hadfield (who shot at the king in the theatre), and was passed about a month after the judgment of the court in that case. That act was so framed as to reach back and cover the case of Hadfield, who had been acquitted by the jury on account of his insanity, and who had been remanded to the prison from whence he came. It was stated by the court, and admitted by the attorney-general, and the prisoner's counsel, Mr. Erskine, that, by the common law, the court might do this in such a case, but it was all they could do. They could not change the place or manner of his confinement. Hadfield was tried on the 26th of June, 1800; and on the 30th, in the house of commons, the attorney-general moved for leave to bring in the bill which resulted in the act of 39 & 40 Geo. III. c. 94. In support of his motion he observed, that, 'by the common law, when a person of this kind is acquitted, the court before which he is tried, have full power to direct the safe custody of such a person; but then the law has so little regulated that custody, and is so silent as to the rules to be observed with regard to it, that it may be said to be defective in that particular.' The 1st section of the act relates to cases of treason, felony, and murder only; and is applicable as well to persons who had been already remanded upon acquittal on the ground of insanity, as to future cases. It provides that in all such cases, if evidence of insanity be given upon the trial, and the party be acquitted on the ground of insanity, and it shall be so stated by the jury, the court shall order him to be kept in strict custody, in such place, and in such manner as to the court shall seem fit until his majesty's pleasure shall be known; and that his majesty may give order for the safe custody of such person during his pleasure, in such place and manner as to him shall seem fit. The 2d section provides, that if any person indicted for any offence, shall be insane, and shall, upon arraignment, be so found by a jury impanelled for that purpose, so that he cannot be tried; or if, upon the trial of any person, so indicted, the jury shall find him insane, the court may make a like order, as provided in the 1st section. And if any person, charged with any offence, shall be brought before any court to be discharged for want of prosecution, and such person shall appear to be insane, it shall be lawful for such court to order a jury to be impanelled to try the sanity of

such person, and if found insane, the court may make a like order. By the 3d section, 'for the better prevention of crimes being committed by persons insane,' it is enacted, that if any person shall be discovered and apprehended under circumstances that denote a derangement of mind, and a purpose of committing some crime, for which, if committed, such person would be liable to be indicted, and any of his majesty's justices of the peace, before whom such person may be brought shall think fit to issue a warrant for committing him or her as a dangerous person, suspected to be insane, such cause of commitment being plainly expressed in the warrant, the person so committed shall not be bailed, 'except by two justices of the peace, one whereof shall be the justice who has issued such warrant; or by the court of general quarter sessions, or by one of the justices of his majesty's courts of Westminster hall, or by the lord chancellor, or lord keeper, or commissioner of the great seal.' It is evident, from the provisions of this act, that by the common law, a judge could not do what is asked by this petition, viz., 'to do what belongs to humanity' in regard to an insane prisoner, by confining him in any other place than the common gaol, or in any other manner than as a person charged with an offence, or committed for want of giving surety for the peace or good behavior. If, therefore, the prisoner should be brought up by habeas corpus, and I should remand him at all, it must be to the same custody in which he now is. The suggestion, therefore, in the petition and affidavit, that I can, by committing the prisoner as an insane person, meliorate his condition, or change his custody, is not supported by law, and furnishes no sufficient ground for issuing the writ.

"The only fact alleged in the petition and affidavit as the ground of the prisoner's discharge, is his insanity at the time of committing the act; which fact was not made known at the time of his commitment, but can now be proved by witnesses whose names are indorsed on the petition. After a diligent search, I have found no case in which a court or a judge has, upon habeas corpus sent for and examined witnesses on the part of the prisoner, to prove exculpatory matter, or any other matter when the warrant of commitment was regular, and bore upon its face sufficient cause of commitment. Matter of defence must, after commitment, be left for the jury. The judge cannot try the cause upon habeas corpus. The matter of the return must be taken to be true. The utmost extent to which courts have gone, upon habeas corpus, is to examine the depositions taken by the committing magistrate, upon the examination of the party under the statutes of Philip and Mary, in order to see whether the party may be admitted to bail. In the Case of Bollman, 4 Cranch [8 U. S.] 75, the supreme court, upon habeas corpus, examined the dep-

ositions taken upon the motion to commit; the same having been referred to in the order for commitment, and brought up by certiorari as part of the record; but it was never suggested that that court could receive new evidence. Chitty (1 Chit. Cr. Law, 89) says: 'In modern practice, though exculpatory evidence is received at the instance of the prisoner, and certified with the other depositions' (and therefore taken before commitment), 'unless it appear in the clearest manner that the charge is malicious, as well as groundless, it is not usual for the magistrate to discharge him, even when he believes him to be altogether innocent.' In 1 Leach, Crown Law, 270 (10 Petersd. 284), it is said: 'The court will look into the depositions to see if there be sufficient ground laid to detain the party in custody, and if there be not, they will bail him.' Chitty (1 Chit. Cr. Law, 130) says: 'It is, in fact, to the depositions alone, that the court will look for their direction; for when a felony is positively charged, they will refuse to bail, though an alibi be supported by the strongest evidence. 2 Strange, 1138. Nor will the court at all admit of extrinsic evidence; so that they refused to examine whether a man brought up before them, had been previously acquitted of a charge precisely similar. Id. 851. And the court refused to bail a person for receiving stolen goods, the defendant's affidavit admitting the receipt of the goods, but denying that he knew they were stolen, because that was a fact triable only by a jury; and it would be of dangerous consequence to allow such proceedings, as it might induce prisoners generally to lay their case before the court, who, instead of the jury, would be called upon it to try the truth of the fact for which they were committed.' Cases, K. B. 96; 1 Salk. 104. On an indictment for murder, the prisoner moved to be bailed. 'Rokesby and Turton were for bailing him, because the evidence upon the affidavits read, did not seem to them sufficient to prove him guilty. Holt, C. J., and Gould, contra. The evidence does affect him, and that is enough. The allowing the favor of bail may discourage the prosecution; therefore it is not fit the court should declare their opinion of the evidence beforehand; for it must prejudice the prisoner on the one side, or the prosecutor on the other.' Mr. Chancellor Kent, in his Commentaries (volume 2, p. 26), says: 'Upon the return of the habeas corpus, the judge is not confined to the face of the return, but he is to examine into the facts contained in the return, and into the cause of the imprisonment, whether the commitment be for any criminal or supposed criminal matter, or not. This power of revising the cause of commitment is given by the act of this state,' (New York,) 'and it authorizes the judge to re-examine all the testimony taken before the magistrate who originally committed, and to take further proof on the subject, for he is to examine into the facts; and it is a new power, not found in the English statute.'

"If I were to examine the witnesses now offered by the friends of the prisoner to prove his insanity, I should feel myself bound to give notice to the attorney of the United States, and summon witnesses on the part of the prosecution, which would lead to the trial of the whole cause without a jury. No such case has been found in all my researches, and the impropriety of it seems too evident to admit of argument. But if I could, in any case upon habeas corpus, hear witnesses for the prisoner, it seems to me that the case of insanity would be an exception. The fact charged in the commitment being proved to the satisfaction of the committing magistrate, the allegation of insanity is matter of defence or excuse proper for the consideration of the jury, who are the judges of the fact. Every person, of the age of discretion, is presumed to be of sane memory unless the contrary be proved. It is a very nice point to decide what degree of insanity will render a person irresponsible for his acts; and it is the peculiar province of the jury to say whether the prisoner's insanity is of that degree. If, therefore, the witnesses were to satisfy me that the prisoner was insane it would be impossible for me to say that the jury also would be satisfied that the insanity was of such a degree as rendered the prisoner wholly irresponsible; in such a case I could not discharge him; and it is very doubtful whether I could bail him, as he could not bind himself in a valid recognizance; and I am not certain that the sureties of a madman would be held bound to produce him· and if they were, yet surety of the peace or good behavior would be wanting; the validity of which, if given, would be still more doubtful, as before suggested. Lord Hale (1 Hale, P. C. 32, 33), speaking of insanity, says: 'Now, touching the trial of this incapacity, and who shall be adjudged in such a degree thereof as to excuse from the guilt of capital offences, this is a matter of great difficulty, partly from the ease of counterfeiting this disability when it is to excuse a nocent, and partly from the variety of degrees of this infirmity, whereof some are sufficient and some are insufficient to excuse persons in capital offences. Yet the law of England hath afforded the best method of trial, that is possible, of this and all other matters of fact, namely, a jury of twelve men all concurring in the same judgment, by the testimony of witnesses, viva voce, in the presence of the judge and jury, and by the inspection and direction of the judge.' 'Therefore, the trial of the incapacity of the party indicted or appealed of a capital offence, is upon his plea of not guilty, by the jury upon his arraignment, who are to inquire · thereupon touching such incapacity of the prisoner, and whether it be to such a degree as may excuse him from the guilt of a capital offence.' And in page 34 he says: 'If a man, in his sound memory, commits a capital offence, and before arraignment he becomes absolutely mad, he ought not by law to be arraigned during such frenzy; but be remitted to prison, until that incapacity be removed.' And in page 35 he says: 'If a person of non-sane memory commit homicide during such his insanity, and continue so to the time of his arraignment, such person shall neither be arraigned nor tried, but remitted to gaol, there to remain in expectation of the king's grace to pardon him But it seems in such a case it is prudence to swear an inquest, ex officio, to inquire touching his madness, whether it was feigned, and thus it was done in 3 Edw. III., and in Somervile's Case, And. pt. 1, No. 154. But in case a man, in a frenzy, happen, by some oversight, or by means of the gaoler, to plead to his indictment, and is put upon his trial; and it appear to the court, upon his trial, that he is mad, the judge, in his discretion, may discharge the jury of him, and remit him to gaol, to be tried after the recovery of his understanding, especially if any doubt appear upon the evidence touching the guilt of the fact, and this in favorem vitæ. And if there be no color of evidence to prove him guilty, or if there be pregnant evidence to prove his insanity at the time of the fact committed, then, upon the same favor of life and liberty, it is fit it should be proceeded in the trial, in order to his acquittal and enlargement.'

"Upon the whole, therefore, being perfectly satisfied that I have no authority to discharge the prisoner upon the alleged ground of insanity, if it were established; and that if brought up by habeas corpus he must be immediately remanded, it seems to me that it would be useless to issue the writ, and that it is my duty to refuse it."

On the 11th of April, 1835, the cause came on for trial before the circuit court. The indictment was at common law, for an assault upon Andrew Jackson, president of the United States, with intent to kill and murder him.

Mr. Key, for the United States, admitted the law respecting insanity to be correctly stated by Mr. Erskine in Hadfield's Case, 27 How. State Tr. p. 1300, &c. The fact that the prisoner was under a mental delusion, in supposing himself to be king of England, and of the United States as an appendage to England, and that General Jackson stood in his way in the enjoyment of his right, and that the act was done under that delusion, was fully proved: and the jury, in five minutes, returned the following verdict: "We find the prisoner not guilty; he being under the influence of insanity at the time he committed the act."

THE COURT (THRUSTON, Circuit Judge, absent) remanded the prisoner, being of opinion, from the evidence, that it would be extremely dangerous to permit him to be at large while under this mental delusion.

[See Case No. 15,576.]